**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| v. | \* | Criminal No.: 20-193-ELH |
| **BRYANT WILLIAMS** | \* | |

\*   \*   \*   \*   \*

**MOTION TO SUPPRESS EVIDENCE (WARRANTLESS SEARCH)**

Bryant Williams, through his undersigned counsel, hereby respectfully moves this Honorable Court, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, to suppress tangible and derivative evidence obtained from his unlawful arrest and the illegal search of a vehicle he was driving, both occurring on March 18, 2020. As grounds therefore, Mr. Williams states the following:

**Relevant Facts**

The story of Mr. Williams' prosecution begins, as it commonly does when describing the arrest of Black men in Baltimore City, with a pretextual car stop by the Baltimore City Police Department (BPD) for alleged traffic violations.[1] On March 18, 2020 at around 12:50 in the afternoon, Baltimore Police Department Detective Bezzek stopped a car being driven by Mr. Williams because the car's tags were flagged by the Motor Vehicle Administration (MVA) as being suspended.[2] The car, a Hyundai sedan with clear, non-tinted windows, was pulled over in

---

[1] Mr. Williams concedes that pursuant to Whren v. United States, a pretextual car stop is not unreasonable under the Fourth Amendment if police had "probable cause to believe [the driver of the vehicle] had violated the traffic code." 517 U.S. 806 (1996). Mr. Williams does not concede that police had the requisite probable cause to stop him, and further contends that Whren was wrongly decided, particularly given BPD's well-documented history of abusing the privilege to make such stops. See Investigation of the Baltimore City Police Department, U.S. D.O.J, August 10, 2016, at 24 ("And a deployment memo posted in one of BPD's districts in the summer of 2015 likewise encouraged officers to suppress crime through "proactive enforcement," including "stop and frisk," "street level drug enforcement," "warrant checks," "foot patrol," "car stops," and "quality of life" arrests.")

[2] A large portion of the traffic stop is recorded on Det. Bezzek's body-worn camera. This factual recitation is based on that video, the incident report drafted by Det. Bezzek, and the KGA recording

the middle of a sunny day in a bustling, well-populated area near Hollins Market.  Mr. Williams was immediately cooperative with Det. Bezzek.  Mr. Williams kept both hands visible on the Hyundai's steering while, and promptly admitted to Det. Bezzek that he did not have a driver's license.  Mr. Williams provided his full name and birthday as well as the Hyundai's registration and insurance information.  Though Det. Bezzek would later describe Mr. Williams as being "very interested in [Det. Bezzek's] position, and claims in his written report that Mr. Williams "constantly maintained visual of [Det. Bezzek] . . . ," Police Report, 1, the recording of their encounter reveals that Det. Bezzek raised no alarm as to Mr. Williams' behavior to other officers, did not perform any protective pat-down of Mr. Williams, and permitted Mr. Williams to remain, unrestrained, in the Hyundai throughout most of their encounter.

Det. Bezzek informed Mr. Williams that "the reason why [he] stopped [Mr. Williams] was just because the tags were suspended for insurance."  Mr. Williams responded that he thought that the car was insured.  Det. Bezzek asked if Mr. Williams could "prove it?" and Mr. Williams responded that he could have proof of the Hyundai's insurance "sent to the phone right now."  Det. Bezzek returned to his police cruiser while telling Mr. Williams to "do that while [Det. Bezzek] takes care of everything in [his police cruiser.]"

Det. Bezzek then permitted Mr. Williams to remain in the Hyundai while Det. Bezzek checked the information in his police cruiser.  Other officers arrived on scene and chatted amicably with Mr. Williams, and then with Det. Bezzek.  Det. Bezzek asked Mr. Williams for his Maryland identification, and Mr. Williams immediately complied.  Det. Bezzek does not call for a tow truck.

After providing his identification card to Det. Bezzek, Mr. Williams asked "if he could pull [the Hyundai] over and park it?"  The following exchange between the men ensued:

---

memorializing police communication during the stop.  All quotes are to these sources and all three will be provided to the Court under separate cover in anticipation of a hearing on this motion.

>Det. Bezzek: You can leave it right here.  Do me a favor, call someone with a valid license and they can drive the car from here.  Actually, sorry, I …scratch that … I forgot that your tags are suspended so you can't drive the car.
>
>Mr. Williams:  That's why I said can I pull it over and just park it?
>
>Det. Bezzek: **Yeah, it can stay right here, it's parked**.
>
>Mr. Williams:  That's cool.
>
>Det. Bezzek:  **So, when we are done you can lock it up and we can go from there**.
>
>Mr. Williams: All right.
>
>Det. Bezzek:  Look, I'll be honest with you, I'm always up front, I have to give you citations for the suspended and all that other stuff.  Just show up for court, have everything figured out, and you'll be just fine.

Det. Bezzek then returned to his police cruiser as Mr. Williams answered a call on his cell phone.

Det. Bezzek entered Mr. Williams' identification information into his dashboard-mounted computer.  He also asked another officer to "call hot desk for him," likely to check whether Mr. Williams had any outstanding warrants.  See BPD Policy 1104 (describing the "hot desk" as the repository for warrants).  Following a short conversation with another officer, Det. Bezzek returned to Mr. Williams, who was still seated in the Hyundai, and stated:

>The problem is, you have like 15 violations right now, dude.  I'll give you a warning on what I can, ok, I'll help you out with whatever I can, but I got to give you something, all right, I mean, like, you also have a suspended license, you shouldn't be driving, you know that, you know what I mean? But like I said, you show up to court, get everything figured out, I have no problem telling the ASA you were cooperative and all that type of stuff so it bears in your favor, ok, and you know, if you show up and you get everything corrected, 9 times out of 10, they drop it anyway.

Det. Bezzek returned to his police cruiser and continued to write citations for Mr. Williams.  Again, no call for a tow truck was made by Det. Bezzek or any other officer on scene.

While drafting the citations and warnings for driving offenses, Det. Bezzek learned from another officer that Mr. Williams reportedly had two outstanding warrants for his arrest.  Det. Bezzek told other officers on scene to immediately arrest Mr. Williams, stating "pull him out, put him in cuffs, get it over with."  Body-worn camera footage and contemporaneous KGA recordings

reflect that at 1:05 pm, Det. Bezzek called for a wagon (a code "10-14") to transport Mr. Williams to Central Booking for processing on the alleged arrest warrants.[3]

Officers promptly removed Mr. Williams from the Hyundai. Mr. Williams was quickly handcuffed, but protested the existence of the outstanding warrants. Det. Bezzek told Mr. Williams that one warrant appeared to be "a failure to appear" and agreed to check again on the warrants. Det. Bezzek permitted Mr. Williams to speak with Mr. Williams' sister on the phone and promised to let Mr. Williams smoke a cigarette. Their exchange remained amicable, and Det. Bezzek searched Mr. Williams and found a medication in a pill bottle that was in Mr. Williams' name. He informed Mr. Williams that Mr. Williams can keep the medication in his possession so that Mr. Williams would have it when he was detained on the warrants.

Mr. Williams was seated on the curb behind the Hyundai in between several armed officers. Det. Bezzek then returned to his police vehicle to complete the citations and warnings. Again, no tow truck is requested.

Det. Bezzek later returned to Mr. Williams, who remained on the ground, still handcuffed. Det. Bezzek presented Mr. Williams with citations and warnings for driving offenses and repeated that Mr. Williams has two outstanding warrants. One of these, Det. Bezzek repeated, is for a "failure to appear," but Det. Bezzek admitted that he "d[idn't] know what the other one is [for]." No tow truck is requested.

Mr. Williams' sister then arrived on the scene, and Mr. Williams asked if Det. Bezzek can give his sister "the [Hyundai's] keys so she can lock the car up and stuff, please?" Det. Bezzek responded, "**yeah, we'll do that**, we got to get to that, there is a process." He placed the citations in Mr. Williams' pocket and immediately headed toward the Hyundai. Mr. Williams' sister then asked Det. Bezzek for the keys to the Hyundai. Det. Bezzek opened the closed door to the Hyundai

---

[3] KGA reflects some confusion over the whereabouts of the police wagon. Officers on scene make several requests for the wagon and clarify their location at 1:17 p.m. The wagon eventually arrives.

and responded, "**in a second, when we're done, can you just go stand over there for us?**" Det. Bezzek did not call for a tow truck but instead opened the Hyundai's closed door, entered the car, and began to rummage through its contents.

Det. Bezzek started by rifling through the contents of the pocket on the driver's side door, then moved to the car's center console. Soon after Det. Bezek opened the console, he purportedly discovered a handgun (a Taurus model bearing serial number SDP19270).[4] Det. Bezzek grabbed the firearm, without protective gloves, and ordered the other officers on scene to provide a "toe tag" (or "tow tag") for an "HGV," police jargon for a handgun violation.[5] He then placed the handgun on the Hyundai's front seat, and donned latex gloves. At 1:19 pm, Det. Bezzek radioed police dispatch to request a CAD number for a handgun violation, stating "yeah, on my car stop[,] can you assign me an on view for a handgun violation, please." Seated nearby, Mr. Williams and his sister protested the lawfulness of the search of the Hyundai. Det. Bezzek responded, **"[y]ou have a warrant, I am allowed to search your car!**"

After a discussion about another item taken from the Hyundai,[6] Det. Bezzek asked an officer to "request a tow for the car." When Mr. Williams and his sister objected, Det. Bezzek responded, "**yeah, the car has to be towed, there was a handgun in the car, the car has to be**

---

[4] Body camera footage doesn't capture the exact discovery of the alleged firearm, but Det. Bezzek wrote in his report that it was recovered from the center console.

[5] The definition of a "toe" or "tow" tag may be of relevance to the disposition of this motion. The undersigned assumes it is the former and simply means a request for the evidence tag used to label an item of evidentiary value.

[6] Officers found a small pill bottle containing less than a tablespoon of a liquid in the Hyundai's center console. Officers couldn't identify the substance, and at least one officer posited that it was CBD oil, a legal and commonly-purchased product primarily used as a homeopathic remedy for a variety of ailments. Another officer suggested the substance was methadone, while Det. Bezzek noted that he thought it looked like an illegal substance, but he couldn't "remember [its] name." Det. Bezzek later described the substance in his report as an "unknown syrup chemical compound believed to be suspected CDS."

**towed, I don't have discretion there, you should have been honest with me from the very beginning**."

At 1:23 pm, KGA recorded an officer asking dispatch to "order up a tow." This is the first request for a tow truck for the Hyundai and came over a half hour after the Hyundai was stopped, and several minutes after it was searched. Following the call for a tow truck, Det. Bezzek returned to the Hyundai to secure a cigarette for Mr. Williams. He then quickly searched the center console again, and the glove compartment, pulling out and reviewing paperwork he found. He returned to the car later, rummaging through paperwork in the back seat of the Hyundai before closing its windows and doors. To date, no inventory of the Hyundai has been provided.

Mr. Williams is charged in a one-count indictment with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g). He has pleaded not guilty.

## Argument

Mr. Williams moves for the suppression of the evidence obtained from his person and the Hyundai because that evidence was obtained during a search that violated the Fourth Amendment. Mr. Williams further submits that officers did not have reasonable suspicion or probable cause to stop or arrest him in the first place. Mr. Williams also moves to suppress all derivative information obtained from a result of this search, in part because any such evidence must be suppressed under the fruit of the poisonous tree doctrine. See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). Specifically, Mr. Williams moves to suppress any statements made to police and any additional evidence obtained by police after Mr. Williams' illegal stop.

The search of the Hyundai was unlawful because Det. Bezzek did not have probable cause to believe it contained evidence of a crime. Nor can the search of the Hyundai be supported as a search incident to a lawful arrest. See Arizona v. Gant, 556 U.S. 332, 335 (2009) (finding that police may search a car incident to arrest: (1) when "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle" or (2) "the arrestee is unsecured and within

reaching distance of the passenger compartment at the time of the search."). Here, Mr. Williams was first arrested on a warrant for a "failure to appear" in court, and Det. Bezzek thus had no reason to believe any additional evidence of that offense would be found in the Hyundai. Further, Mr. Williams was secured by officers outside of reaching distance of the Hyundai at the time of the search.

Since the search of the Hyundai was not supported by a warrant or justified by independent probable cause, Det. Bezzek is constrained to claiming it was an inventory search, a narrow exception to the Fourth Amendment. Police Report, 1 ("While awaiting the arrival of the wagon, this Detective began to conduct an inventory search of the vehicle prior to the vehicle being towed to city yard.") "For the inventory search exception to apply, the search must have 'be[en] conducted according to standardized criteria,' such as a uniform police department policy[,] and performed in good faith." United States v. Matthews, 591 F.3d 230, 235 (4th Cir. 2009) (quoting Colorado v. Bertine, 479 U.S. 367, 374 n.6 (1987)); see also South Dakota v. Opperman, 428 U.S. 364, 369-71 (1976) (noting that even if an "inventory" is "characterized as a 'search,' the intrusion is constitutionally permissible.").

An inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017). However, an "inventory search" is only legal if it is "routine and conducted pursuant to standard police procedures," and only if "the purpose of the inventory is to secure the car or its contents and **not to gather incriminating evidence against the owner**." United States v. Brown, 787 F.2d 929, 932 (4th Cir. 1986) (emphasis added). Stated differently, "an inventory search policy must restrict discretion in order to tether inventory searches to their permissible purposes and prevent them from becoming 'a ruse for general rummaging in order to discover incriminating evidence.'" United States v. Seay, 944 F.3d 220,

223 (4th Cir. 2019); see also Florida v. Wells, 495 U.S. 1, 4 (1990) (noting that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.")

Here, the claim that the Hyundai was subject to an "inventory search" in anticipation of a tow is belied by KGA recordings and body-worn camera revealing that no tow was requested until well *after* the car was already searched (and the handgun purportedly found). Further, Det. Bezzek repeatedly states on camera that he never intended to tow the Hyundai before the discovery of the handgun. He informed Mr. Williams that the car was safely parked and could remain where it was. He told Mr. Williams that he was going to write Mr. Williams warnings and citations, and was not going to arrest him for any alleged traffic violations. Even after Mr. Williams' arrest on alleged outstanding warrants, Det. Bezzek continued to express absolutely no intention to tow the vehicle, never called for a tow truck, and even promised Mr. Williams and his sister that he would return the vehicle's keys "in a second."

In truth, Det. Bezzek never intended to tow the Hyundai until *after* he found the handgun and thus did not perform an inventory search in anticipation of a tow. The Court need not stretch to make this finding as Det. Bezzek conceded as much multiple times during the hour-long encounter with Mr. Williams, most explicitly when he claimed that he was "allow[ed] to search" the Hyundai because Mr. Williams "h[ad] a warrant," and later when he candidly admitted that the Hyundai was only towed because "there was a handgun in the car." Det. Bezzek also stated that the car would *not* have been towed at all – and thus presumably not searched – had Mr. Williams just "been honest with [Det. Bezzek] from the very beginning."[7] The Hyundai was not searched

---

[7] Det. Bezzek's insinuation is clear: had Mr. Williams incriminated himself and acknowledged possession of a firearm, Det. Bezzek wouldn't have illegally searched the Hyundai. Forcing an someone to "choose" between constitutional rights is impermissible. See, e.g., United States v. Midgett, 342 F.3d 321, 327 (4th Cir. 2003) ("We conclude that, in the circumstances of this case, the court impermissibly forced the defendant to choose between two constitutionally protected rights: the right to testify on his own behalf and the right to counsel."); Doyle v. Ohio, 426 U.S. 610 (1976) (prohibiting use of post-arrest and post-Miranda silence in attempt to impeach a testifying defendant). Thus, Det. Bezzek's assertion that the Hyndai would not have been towed had Mr. Williams incriminated himself at the beginning of the car stop by admitting that he was

pursuant to the "inventory search" exception and thus its search was unlawful. The fruits of that search – namely the handgun at the heart of this case – must be suppressed.

Further, the inventory exception is not applicable here because the impounding of the Hyundai constituted an unreasonable seizure as police were never in lawful custody of the car prior to the discovery of the handgun. "For an inventory search to be valid, the vehicle searched should first be in the valid custody of the law enforcement officers conducting the inventory." Brown, 787 F.2d at 931–32. Det. Bezzek's written report fails to articulate a valid reason for the Hyundai to be impounded. Police Report, 1 (noting that he searched the car because it was goingto be "towed to city yard.") As noted repeatedly throughout their encounter, Det. Bezzek did not arrest Mr. Williams for driving offenses and agreed to allow the Hyundai to remain parked at the location where Det. Bezzek stopped it. The Hyundai was out of the flow of traffic, legally parked, did not pose any threat to the public, and Mr. Williams – who had answered all of Det. Bezzek's questions accurately and handed over his identification – provided police with other people to whom the car could be safely released (including his sister, who was actually on scene). Thus, impounding (and towing) the Hyundai would have been an unreasonable seizure, and an inventory search cannot be justified on that basis. Id. at 932 (noting that impounding a vehicle was appropriate only when "there was no known individual immediately available to take custody of the car, or because the car could have constituted a nuisance in the area in which it was parked.").

Despite Det. Bezzek's well-chronicled intention to allow the Hyundai to remain where it was parked, the government may claim that a reported "pick up order" for the car's tags provided authority to tow the car. It does not. Even assuming a valid "pick up order" was issued – a fact Mr. Williams does not concede – such an order from MVA is a command to seize a vehicle's *license plates*, not the vehicle itself. See Maryland Transportation Code § 13-708(a). And even

---

in possession of a firearm is unlawful as it forces an arrestee to trade one constitutional right (silence) for another (freedom from unreasonable searches and seizure).

then, a tow of the vehicle is not automatically authorized once plates are removed. State law permits authorities to tow "abandoned" vehicles, but an "abandoned vehicle" is defined as one that is "not displaying currently valid registration plates" and has remained on "public property" for "**more than 48 hours**." Maryland Transportation Article § 25-201 (b)(7)(i)(emphasis added). Even if the Hyundai was parked on public property without plates,[8] it would had been there for only a few minutes and not the two full days required for "abandonment."[9] Thus, police did not have had the authority to seize (and tow) the Hyundai prior to the discovery of the handgun, and an "inventory search" in anticipation of an illegal seizure is unreasonable. Brown, 787 F.2d at 931–32. The evidence should be suppressed.

## Conclusion

**WHEREFORE**, as a result of the constitutional violations alleged herein, in any supplemental memoranda, and from evidence presented at any hearing on this motion, the defendant requests that this Court enter an Order suppressing for use as evidence all tangible and derivative evidence seized as a result of the illegal stop, search, and seizure of Mr. Williams and any such other and further relief that this Court deems appropriate. Investigation of the allegations against Mr. Williams is ongoing and defense counsel therefore reserves the right to request leave to supplement this motion as additional information becomes available.

Respectfully Submitted,

James Wyda
Federal Public Defender

_____/s/_____
NATE SMITH, # 813194
BRENDAN A. HURSON, #28179
Assistant Federal Public Defenders

---

[8] Body-worn camera footage reveals that the plates were not removed from the Hyundai until well after discovery of the handgun.

[9] The Baltimore City Code adopts the same definition of "abandoned." See Baltimore City Code, Article 31, Transit and Traffic § 31-1(a).

100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962; Fax: (410) 962-0872
Email: Brendan_Hurson@fd.org;
Nate_Smith@fd.org

## **REQUEST FOR HEARING**

Pursuant to Rule 105.6 of the Local Rules of the United States District Court for the District of Maryland, a hearing is requested on the defendant's motion.

                                  /s/_____
BRENDAN A. HURSON
Assistant Federal Public Defender